[No. 13051. Department One. February 17, 1916.]

ROBERT HOFFMAN, *Respondent,* v. I. R. WATKINS, *Appellant.*[1]

PHYSICIANS AND SURGEONS—MALPRACTICE—NEGLIGENCE—EVIDENCE —QUESTION FOR JURY. In an action for malpractice, the question of negligence in failing to discover a dislocation of the shoulder is a question for the jury, where the testimony as to the making of any of the usual tests was conflicting, experts agreed that failure to do so would be failure to exercise ordinary care and skill, any subsequent injury was denied, and medical witnesses testified that the dislocation found later was of such long standing as to show that it existed when the defendants first treated the plaintiff and failed to discover it.

APPEAL—DECISION—LAW OF CASE. A decision on a prior appeal that substantially the same evidence was sufficient, becomes the law of the case.

PHYSICIANS AND SURGEONS—MALPRACTICE—ISSUES—INSTRUCTIONS. In an action for malpractice in failing to discover a dislocation of the shoulder, where the sole issue was whether the defendant had applied the concededly necessary tests which he claimed to have applied, a requested instruction to the effect that the jury must be governed solely by the testimony of experts skilled in the practice of medicine in determining the question of defendant's lack of due care, is properly refused.

SAME. In such a case, it is proper to submit such issue with an instruction that the experts agreed as to the proper tests to be made and that the defendant claimed to have made the same, such being the undisputed facts.

SAME—MALPRACTICE—DAMAGES—EXCESSIVE VERDICT. A verdict for $4,000 for malpractice in failing to discover and reduce a dislocation of the shoulder is excessive, and should be reduced to $2,400,

[1] Reported in 155 Pac. 159.

where it appears that the dislocation was subsequently reduced and the permanent effects do not materially diminish plaintiff's earning capacity.

Appeal from a judgment of the superior court for Chehalis county, Claypool, J., entered November 14, 1914, upon the verdict of a jury rendered in favor of the plaintiff for $4,000, in an action for malpractice. Reversed, unless $1,600 is remitted.

*John C. Hogan* and *J. B. Bridges*, for appellant.

*A. Emerson Cross* and *Hugo Metzler*, for respondent.

ELLIS, J.—Action to recover damages for alleged malpractice of a physician in the treatment of an injured shoulder. On a former appeal, Department Two of this court reversed a judgment for plaintiff and remanded the case for a new trial. *Hoffman v. Watkins*, 78 Wash. 118, 138 Pac. 664.

At both trials it appeared that, on Sunday night, February 3, 1912, plaintiff, a man fifty-four years old, was assaulted on the streets of Aberdeen, knocked down, and stunned and robbed, sustaining a cut over the eye and a severe injury to the right shoulder. At both trials the gravamen of the charge of negligence was the failure of defendant to diagnose the injury to the shoulder as a dislocation. On the next morning after the injury, one Dr. Riley called, treated the cut over the eye, and diagnosed the injury to the shoulder as a sprain. On that same or the next evening, defendant called and also diagnosed the injury as a sprain. Two or three days afterwards, plaintiff visited defendant's office, where defendant claims he again examined the shoulder and found it merely sprained. Each of these physicians testified that he examined the shoulder for a dislocation by inserting the fingers in the arm pit, and also by placing the right hand of the patient on the opposite shoulder with the elbow pressed against the side or chest, and that, by these tests, it was de-

termined absolutely that there was no dislocation. These two, and every other physician who testified, stated that these are infallible tests for any kind of dislocation of the shoulder, and that, when the hand and elbow can be so placed, the conclusion is invariable and absolute that there is no dislocation, but that if this cannot be done, the contrary conclusion is just as absolute. Dr. Bowlby, a dentist who occupied an office adjoining that of Dr. Riley, testified that he assisted the latter at one time in making this test.

The testimony on behalf of plaintiff tended to show that neither Dr. Riley nor the defendant applied this or any other test or attempted to lift, move or manipulate the arm in any way. Plaintiff followed defendant's directions for about four weeks, during a part of which time and thereafter for three weeks more, he took electrical treatment from Dr. Riley. He claims that the shoulder steadily grew worse and finally, on March 25th, he went to Dr. Randolph of the Aberdeen General Hospital, who with his assistant, Dr. Austin, examined the shoulder, applied the above mentioned tests, measured the two shoulders, found that the injured shoulder was lower than the other, and that the plaintiff was suffering from a subglenoid or downward dislocation of the shoulder. The patient was placed under an anaesthetic and the shoulder was subjected to severe manipulation in an effort to reduce the dislocation, but without success. Owing to the long standing of this dislocation, the head of the humerus had become attached to the bone below the socket by a fibrous growth, and certain muscles had become so shortened as to prevent a reduction without an incisive operation. This was deemed immediately inadvisable because of soreness and swelling induced by the manipulations. Moreover, the patient would not at first consent to it. Finally, on April 25th, the operation was performed by Drs. Randolph and Austin. They made an incision at the top of the shoulder, split the muscles longitudinally, severed certain minor muscles, cut the fibrous growth and set the head of the humerus in the

socket.   The plaintiff has so far recovered that he can raise the arm to a level with his shoulder, but cannot do work requiring a higher movement.   There was evidence tending to show that this condition will be permanent.

At the first trial, an effort was made to show that the dislocation was caused by the manipulations of Drs. Randolph and Austin on March 25th.   That position was entirely abandoned on the second trial.   In its stead an affidavit of one Boetcher, a son-in-law of plaintiff, which was admitted as evidence to avoid a continuance, was read.   It stated, in substance, that on a night early in March, 1912, plaintiff's wife went out for the evening leaving Boetcher at the house with the children ; that he heard a noise as of some one falling ; that he went to the door, found the plaintiff lying on the ground drunk to unconsciousness ; that he brought plaintiff in, placed him in a chair and went back to bed ; that shortly afterwards plaintiff's wife came home and he heard her scolding while putting plaintiff to bed ; that the next morning plaintiff remembered nothing of the occurrence, but complained that he had hurt his sore shoulder.   Plaintiff's wife positively denied that she at any time ever went away in the evening leaving Boetcher in the house and denied the above incident *in toto*.   Both plaintiff and his wife testified positively that he had never received any injury to the shoulder between the time of the assault and his first visit to Dr. Randolph.   The reception of Boetcher's affidavit and Dr. Bowlby's testimony, and the elimination of the testimony touching defendant's contract with the lumber company, referred to in the first opinion, and the testimony tending to show that the shoulder might have been dislocated by the manipulations of Drs. Randolph and Austin on March 25th, present the only substantial differences in the testimony adduced at the second trial from that adduced at the first.   The trial resulted in a verdict and judgment for the plaintiff for $4,000.   Defendant appeals.

It is asserted that there was not only an entire lack of evidence to support a finding that there was any dislocation of the shoulder during any of the time while respondent was under appellant's treatment, but that the evidence affirmatively showed that there was no dislocation during that time. The latter assertion is based solely upon the testimony of Drs. Riley and Watkins and the dentist Bowlby that the above mentioned infallible tests were applied and demonstrated that there was no dislocation. It overlooks the fact that the testimony on behalf of the respondent tended to negative the claim that the tests were in fact at any time applied, or that anything more than a perfunctory examination of the arm and shoulder was at any time attempted. The first assertion is based upon the theory that the undisputed evidence of the dislocation found on March 25th was no evidence that there was a dislocation on February 3d. Standing alone this, of course, would be true, but when considered in connection with the evidence of a sufficient cause of the dislocation on February 3d, and the testimony of both the respondent and his wife that the shoulder had suffered no injury in the meantime, and the testimony of Dr. Randolph indicating that the dislocation was one of several weeks' and possibly two or three months' standing, the condition of the shoulder on March 25th became clearly competent evidence for the consideration of the jury as tending to establish a dislocation at the time of appellant's first examination of the arm. The question is not one of presumption, but proof of a condition, coupled with evidence negativing any other hypothesis than that the condition was created at a certain time.

Much stress is laid on the fact that the respondent was not called to deny Boetcher's affidavit that he had said, prior to March 1st, that the shoulder was improving, nor any of the statements contained in that affidavit. Counsel again overlooks the fact that respondent had already testified that, throughout the whole period, the shoulder had become steadily

worse, and that he had suffered no injury to it save that of
February 3d. Attention is also directed to the fact that
respondent was not called to deny Dr. Bowlby's statement
that he had heard respondent admit in Dr. Riley's office that
the arm was improving. Here, again, counsel overlooks the
fact that respondent had already denied that he ever saw
Dr. Bowlby in Dr. Riley's office or elsewhere. The evidence
was conflicting. The question of negligence was clearly one
for the jury, even as an original question. Moreover, all
question as to the sufficiency of the evidence is foreclosed
by the decision on the former appeal. The same argument,
based upon substantially the same evidence, and the addi-
tional evidence tending to show that Drs. Randolph and
Austin had themselves dislocated the shoulder, was then
made. Substituted for that we now have the controverted
Boetcher testimony. If the evidence was sufficient to take
that question to the jury then, so, also, is the evidence now
before us. If it had not been considered sufficient, the case
would have been dismissed for lack of proof. That decision
is the law of the case. See: *Perrault v. Emporium Depart-
ment Store Co.*, 83 Wash. 578, 145 Pac. 438.

Appellant requested an instruction to the effect that, in
determining whether any act or omission on his part in di-
agnosing and treating the injury was a lack of due care and
skill, the jury must be governed solely by the testimony of
experts skilled in the practice and science of medicine and
surgery. The request was properly refused. It was an ad-
mitted fact in the case, about which there was no dispute
and on which the expert testimony on both sides coincided,
that the application of the tests which the appellant claims
he made would infallibly have demonstrated the existence
or absence of a dislocation. It is also an undisputed fact,
to which every expert witness, including the appellant,
testified, that the failure to apply these tests would be a
failure to exercise that reasonable and ordinary care and
skill used by physicians and surgeons engaged in the same

line of practice in similar localities. The sole controverted question was whether the appellant had applied those tests. This, it was admitted, could be determined by any evidence as to what the appellant actually did or failed to do in his examination of the arm. That being the sole disputed question, it would have been both unnecessary and confusing to have submitted to the jury the technical question as to what tests should have been made.

The court instructed the jury on this subject as follows:

"You are instructed that there is no difference of opinion among the expert physicians and surgeons who have testified in this case as to the manner of examination and application of tests in a case of such an injury as the plaintiff claims to have received. The physicians who have testified have all agreed to the nature, extent, and method of such preliminary examination. The defendant claims to have used these tests and to have made such examination; and whether he did or did not do so, is the question of fact to be determined by you from the testimony in the cause and under the same rules as the other testimony is to be considered and as herein set out for your guidance."

Appellant urges that the giving of this instruction was grave error. But what we have already said touching the requested instruction makes it plain that the trial court took the proper view of the matter and submitted to the jury the one question about which there was any dispute. We find no error in this instruction.

Finally, it is urged that the verdict is excessive. In this view we concur. The evidence indicates that the shoulder has entirely recovered and is now giving the respondent no pain. While it is true that some of the effects of the operation are permanent in their nature, the evidence shows that the respondent's earning capacity is not materially diminished. It is true that he cannot perform those tasks which necessitate lifting above the level of his shoulder, and it is true also that he has suffered much pain, inconvenience and considerable expense. The joint, however, so far as the evi-

dence shows, is otherwise unimpaired. In *Taylor v. Kidd,* 72 Wash. 18, 129 Pac. 406, a case similar to this in many respects, the shoulder joint was permanently impaired, the head of the humerus was partially removed, the arm was permanently shortened, and had permanently lost perhaps seventy-five per cent of its original power and scope of motion. The results were evidently much more serious than those found here. In that case a verdict for $5,500 was held to evidence passion and prejudice, and was reduced in the sum of $2,000. We think a reduction in about the same proportion is essential to meet the ends of justice in this case. If, therefore, the respondent will, within thirty days after the transmission of the remittitur from this court, consent in writing to remit $1,600 from the judgment, it will stand affirmed in the remaining sum of $2,400 and costs, and bear interest from the date of its original entry. Otherwise a new trial will be awarded. Costs in this court to appellant.

MORRIS, C. J., MOUNT, FULLERTON, and CHADWICK, JJ., concur.